1

**WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP**
DON SPRINGMEYER, ESQ.

2
Nevada Bar No. 1021
JORDAN BUTLER, ESQ.

3
Nevada Bar No. 10531
3556 E. Russell Road, Second Floor

4
Las Vegas, Nevada 89120
(702) 341-5200/Fax: (702) 341-5300

5
dspringmeyer@wrslawyers.com
JButler@wrslawyers.com

6

Timothy J. Dennin, Esq. (TJD 5117)

7
*(Pro Hac Vice to be Submitted)*
TIMOTHY J. DENNIN, P.C.

8
316 Main Street
Northport, NY 11768

9
(631) 261-0250
*Attorneys for Plaintiffs*

10

11

12

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

13
BLUE SUNSETS, LLC and JENCESS

14
SOFTWARE & TECHNOLOGIES, INC.,

15
                     Plaintiffs,

16
          vs.

17
MYKALAI KONTILAI aka MICHAEL
CONTILE and COLLECTORS COFFEE,

18
INC. dba COLLECTORS CAFE,

19
                     Defendants.

**COMPLAINT**

**JURY DEMAND**

20

21
          Plaintiffs Blue Sunsets, LLC ("BLUE SUNSETS") and Jencess Software & Technologies,

22
Inc. ("JENCESS"), by and through their attorneys, Timothy J. Dennin, P.C. and Wolf, Rifkin,

23
Shapiro, Schulman & Rabkin LLP, by way of Complaint against Defendants, state as follows:

24
**SUMMARY**

25
          1.      This case involves the unregistered sale of $1,500,000 (ONE MILLION FIVE

26
HUNDRED THOUSAND) Dollars of purported Series A preferred shares of Collectors Coffee,

27
Inc. (dba COLLECTORS Cafe) ("COLLECTORS") to Plaintiffs.

28

2.      As painstakingly detailed hereafter, Defendants made numerous material misstatements and omissions, both oral and written, to Plaintiffs in connection with the offer and sale of COLLECTORS'S securities. These misstatements include, *inter alia*, misrepresenting the value of assets purportedly collateralizing Plaintiffs' respective investments and grossly inflating the value of COLLECTORS'S inventory of collectibles memorabilia and number of Dealer contracts.

3.      Defendants provided each Plaintiff with a separate Private Placement Memorandum ("PPM") both of which were dated April 28, 2008 regarding the same offering to sell COLLECTORS'S Series A Preferred shares. Although related to the same purported offering, these PPMs had many irreconcilable and material differences, including the number of shares offered, the identity of the founders of COLLECTORS and the use of the proceeds of the offering. In addition, these PPMs contained materially different information regarding monies purportedly owed by COLLECTORS to Defendant Mykalai Kontilai ("MK"). For example, one version of the PPM reflected that COLLECTORS purportedly "owed" Defendant MK $600,000 in promissory notes while another version omitted this information; one version of the PPM represented that upon funding MK will receive $300,000 for "compensation for past services" while another version failed to disclose this information.

4.      Further, as detailed herein, Defendants have violated their fiduciary duties to Plaintiffs by repeatedly misrepresenting material facts about the company and the value of Plaintiffs' investments, failing to perform the most basic material components of the business plan, misusing and/or dissipating corporate assets as reflected by, *inter alia*, the failure and lengthy delays in paying wages and fees owed to the skeleton crew of employees and consultants hired by COLLECTORS (despite purportedly raising between $20,000,000 to $30,000,000 from investors) and refusing to provide any financial statements regarding COLLECTORS or any information regarding how Plaintiffs' $1,500,000 (and other investors' money) entrusted to Defendants was used.

5.      By virtue of this conduct, Defendants violated §10(b) of the Securities Exchange Act of 1934 (hereinafter also referred to as "Exchange Act") [15 U.S.C. §78j (b)] and Rule 10b-5

[17 CFR §240.10b-5] thereunder, as well as common law fraud, breach of fiduciary duty and other common law violations.

## JURISDICTION and VENUE

6.     The Court has jurisdiction pursuant to §10(b) of the Exchange Act [15 U.S.C. §78j (b)] and Rule 10b-5 [17 CFR §240.10b-5] and §21(d), §21(e) and §27 of the Exchange Act [15 U.S.C. §§78u (d), 77u (e) and 78a (a)].  Defendants, directly or indirectly, singularly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or the mails, in connection with the transactions, acts, practices and courses of business alleged in this Complaint. The Court also has jurisdiction pursuant to 28 U.S.C. §1332 (Diversity of Citizenship) and the amount in controversy exceeds $75,000.

7.     Venue lies in this district pursuant to §27 of the Exchange Act [15 U.S.C. §78a (a)]. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein, occurred within the District of Nevada. Furthermore, the parties herein, pursuant to an executed subscription agreement, agreed to have this controversy heard in Clark County, Nevada.

## THE PARTIES

8.     Plaintiff, BLUE SUNSETS, is a limited liability company formed November 16, 2007, with its principal place of business at 300 Brookside Road in Darien, Connecticut. BLUE SUNSETS is an investor in residential real estate, startups and small businesses, and an independent publisher of books on entrepreneurship. Edwin J. McLaughlin ("Ed McLaughlin") is the Managing Member and CEO of BLUE SUNSETS. Ed McLaughlin and his wife, Barbara B. McLaughlin ("Barbara McLaughlin"), each own fifty percent of BLUE SUNSETS which is run out of their home in Darien Connecticut. Ed McLaughlin and Barbara McLaughlin have been married for 35 years and have raised three children ages 29, 28, and 23. Ed McLaughlin has been investing in real estate, financial equities, and startups for almost 25 years. Ed McLaughlin is an accredited and sophisticated investor. In addition to starting and building four startups, Ed McLaughlin is an angel investor and advisor to entrepreneurs.

-3-

9.     Ed McLaughlin has written and released two books on the subject of starting a business: *The Purpose Is Profit: The Truth About Starting and Building Your Own Business* and *The Startup Roadmap: 21 Steps to Profitability*. Besides writing, Ed McLaughlin speaks frequently in public venues to entrepreneurs and business builders on best practices for building profitable and sustainable businesses.

10.     On or about October 6, 2014, BLUE SUNSETS "invested" $500,000 into COLLECTORS and received stock certificates for 500,000 shares of Series A preferred shares of COLLECTORS. On October 9, 2014, BLUE SUNSETS exercised an option to "invest" an additional $500,000 and received stock certificates for an additional 500,000 shares of Series A preferred shares of COLLECTORS qualifying BLUE SUNSETS to become a member of COLLECTORS purported "Inner Circle of investors." Overall, BLUE SUNSETS invested a total of $1,000,000 and received stock certificates for a total of 1,000,000 shares of Series A preferred shares of COLLECTORS.

11.     Plaintiff, JENCESS is a corporation incorporated in 1983 with its principal place of business is in Edmonton, Canada.  Kirk Jensen is the President of JENCESS. Mr. Jensen is a 57 year old, single father with two children, ages 14 and 12.  Mr. Jensen has been investing in the public markets over the past 20 years and in the private space over the last 15 years.   Kirk Jensen is the founder, and owned for 25 years, a successful international technology business that he sold in 2007 to the Silicon Valley firm, Active. Mr. Jensen has invested in technology, land, pharmaceutical, and oil and gas industries. On or about March 18, 2015, JENCESS "invested" $200,000; and, on or about May 15, 2015 "invested" an additional $300,000 into COLLECTORS and received stock certificates for 500,000 shares of Series A preferred shares of COLLECTORS.

12.     Defendant COLLECTORS, according to the subscription agreements prepared by Defendants and forwarded to Plaintiffs, has a principal place of business at 400 South 4th Street Suite 100, Las Vegas, Nevada 89109.  A PPM dated April 28, 2008, disseminated by Defendants to Plaintiffs represents that COLLECTORS was incorporated on November 1, 2007 and reorganized as a Nevada "C" corporation via merger on February 22, 2008.

13.     Defendant MYKALAI KONTILAI aka MICHAEL CONTILE, (hereinafter "MK") is the purported founder, President and Chief Executive Officer ("CEO") and, according to COLLECTORS'S PPM and amendments thereto disseminated by MK to Plaintiffs, MK is a member and Chairman of COLLECTORS'S Board of Directors. According to an amendment to the PPM dated October 10, 2009, MK holds all the voting shares of COLLECTORS and owns a "Super Majority position of Series A Preferred Shares issued". According to an amendment to the PPM dated April 12, 2016, MK maintained an address at 9 East 8th Street, Ste. 118, New York, N.Y. 10003.

## FACTUAL ALLEGATIONS

### Blue Sunsets' Introduction to COLLECTORS

14.     Ed McLaughlin's introduction to COLLECTORS was through David Chapman, a prior tenant, past borrower, and friend of Mr. McLaughlin. Mr. McLaughlin met Mr. Chapman in June of 2008 when Mr. Chapman was an executive with Ritz Carlton. Mr. Chapman rented one of Mr. McLaughlin's homes in Spring Lake, New Jersey for the months of July 2008 and September 3rd thru October 3rd 2008 under a barter agreement. Rather than paying rent, Mr. Chapman provided Mr. McLaughlin with 33 coupons entitling Mr. McLaughlin to 33 free room nights with Club Level access at any Ritz Carlton Hotel or Ritz Carlton Club property around the world. Mr. Chapman fulfilled all of his obligations under the barter agreement in full and on time.

15.     Based on a successful tenancy during the month of July 2008, Mr. Chapman and Mr. McLaughlin started to cultivate a friendship. Soon thereafter, in August of 2008, Mr. Chapman requested and Mr. McLaughlin agreed to provide a personal loan of $20,000 to underwrite the cost of Mr. Chapman's wife's back surgery. Since Mr. Chapman had fulfilled all of his commitments to that point, Mr. McLaughlin agreed to make the $20,000 loan with specific repayment terms and interest paid in additional Ritz Carlton room nights. Once again, Mr. Chapman had proven trustworthy by fulfilling all of his loan payments and obligations in full and on time. Mr. Chapman and Mr. McLaughlin maintained contact over the ensuing years, helping one another from time to time, and continuing to evolve a friendship.

16.     In July 2014, Ed McLaughlin crossed paths with Mr. Chapman outside Tom Bailey's Market in Spring Lake, New Jersey.  During the happenstance meeting, Mr. Chapman informed Mr. McLaughlin about a potential investment opportunity in COLLECTORS. Mr. Chapman said that he was working for COLLECTORS sourcing funds from investors to underwrite COLLECTORS'S growth and expansion plans.  Mr. Chapman represented to Mr. McLaughlin that COLLECTORS was going to make available the private collectibles market for sale to the public through the internet. Mr. Chapman emphasized the size of the opportunity in the $250+ Billion Dollar per year global market in the collectibles and memorabilia industry. Mr. Chapman claimed that COLLECTORS was ready to launch a transactional website filled with collectibles and memorabilia for purchase and sale from a network of hundreds of Dealers.

17.     During this meeting, Mr. Chapman represented that the business model would drive significant profit on every transaction. Chapman highlighted that COLLECTORS had coordinated with some of the largest insurance carriers in the world to provide an insurance policy authenticating the value of each transaction. According to Chapman this would be a collectibles industry first.

18.     Chapman represented to Mr. McLaughlin that Larry King (host of Larry King Live) would be hosting a weekly TV show, also named COLLECTORS Café, which would be distributed to a national and international audience to draw people to the transactional website.

19.     Chapman emphasized the importance of investing before the price per share increased with the imminent launch of the transactional website and the TV Show. Mr. McLaughlin asked about timing for the launch and the size of the investment and Mr. Chapman stated that COLLECTORS was seeking a minimum $500,000 investment to preserve the pre-launch price and that everything was scheduled to lift-off within the next few months. Mr. Chapman said he would like to set-up a meeting with the founder of COLLECTORS to provide more specific insights and answers to Mr. McLaughlin's questions. Mr. McLaughlin said he needed to learn more from Chapman before engaging with the founder and wasting anyone's time – emphasizing that the sidewalk in front of Tom Bailey's Market was not the right venue to continue the discussion.

-6-

20.     At Mr. Chapman's request, a follow up meeting was held at Mr. McLaughlin's summer home at 1603 Ocean Avenue in Spring Lake, New Jersey in August 2014 to discuss the COLLECTORS investment opportunity. At this meeting, Mr. Chapman explained that the company was the brainchild of an individual by the name of Mykalai Kontilai ("MK") who was the former owner and executive producer of the PBS program "Nightly Business Report." Mr. Chapman explained that MK had direct experience producing TV Shows and he was in the process of finalizing the TV distribution contract for COLLECTORS. Mr. McLaughlin asked Mr. Chapman about MK's track record and experience in starting, operating, and building businesses. Mr. Chapman said the MK had taken over the "Nightly Business Report" reorganized the business, reduced expenses, and, working in combination with the private equity firm that had underwritten the acquisition, sold the business for a substantial profit.

21.     During this meeting, Mr. Chapman advised Mr. McLaughlin that he would send a link to the pilot TV Show hosted by Larry King and Shawn King, Larry's wife. Mr. Chapman claimed that Larry and Shawn King were already filming the first season of episodes of COLLECTORS Café in preparation for the formal launch of the TV Show within the next few months.

22.     Mr. Chapman stated to Mr. McLaughlin that in addition to the transactional website, the TV Show, the insurance carriers, and the significant potential for profit, COLLECTORS owned the original signed Jackie Robinson baseball contracts with the Brooklyn Dodgers and the Montreal Royals. Chapman emphasized that this contract alone was worth more than $24 million (more recently appraised at $36 million) providing a hard asset of value for each investor prorated to their share of ownership. Chapman highlighted that at a $50 million business valuation, a $500,000 investment would equate to a 1% ownership in the Jackie Robinson contract with a prorated value of $240,000 or more. According to Mr. Chapman this would provide Mr. McLaughlin with a hard asset valued at approximately 50% or more of McLaughlin's original investment.

23.     Mr. Chapman said that he would like to set-up an online demonstration to introduce MK and the website developer, Jason Schutzbank of Brand Knew, LLC, as soon as possible. Mr.

McLaughlin agreed to talk with MK about the specifics of the business including the business model (how the company would make money), Larry King's involvement with the TV Show, the role of the insurance carriers, the contractual commitment of the dealer network, the value of the Jackie Robinson contracts, the functionality of the transactional website (Jason Schutzbank's website development experience), and the timing for launching the business. The telephone meeting with MK and the transactional website demonstration with Mr. Schutzbank was set for October 1, 2014.

<u>**Blue Sunsets' Introduction to Mykalai Kontilai**</u>

24.    On October 1, 2014 Mr. McLaughlin was introduced to MK and Jason Schutzbank, the developer of the transactional website. MK re-explained and re-validated all of Chapman's claims about the COLLECTORS business. During this call, MK represented that:

A.    the website was available for demonstration now with formal launch within the next 30 to 45 days (i.e. before Thanksgiving). MK shared that Mr. Schutzbank would be demonstrating the functionality of the website later during the call. MK highlighted Jason Schutzbank's experience in developing high profile websites.

B.    COLLECTORS was in final contract negotiations with CNBC and PBS for a weekly TV Show. Like Chapman, MK emphasized that the price of the stock would be increased as soon as the TV Contract was signed. MK highlighted the need to make a timely investment decision as the TV contract would be signed within the next 30 days.

C.    Larry King and his wife, Shawn, were contracted to host the TV Show and were busy producing the first season of new episodes.

D.    COLLECTORS made 20% of the purchase price every time a collectible was bought and 20% every time a collectible was sold through the transactional website.

E.    COLLECTORS had already signed-up more than 400 dealers representing $3.25 Billion in collectible product inventory which would be available through the transactional website.

F.   every time someone purchased a collectible through the transactional website it would be backed with an insurance policy, from one of the major insurance carriers (AIG, Lloyd's, etc.), guaranteeing the value of each collectible.

G.   the Jackie Robinson contracts were owned by COLLECTORS. MK confirmed that based on a $50 million valuation, a $500,000 investment would equate to a 1% ownership in the Jackie Robinson contracts with a prorated value of $240,000 or more and that the Jackie Robinson contract alone provided McLaughlin with a hard asset value equivalent to 50% or more on a $500,000 investment.

25.   During this call, MK asked Mr. Schutzbank to demonstrate the system. Mr. Schutzbank walked through the features and functionality of the transactional website. Mr. Schutzbank demonstrated how a transaction would be executed and fulfilled, how user groups with shared interests would be formed, while MK highlighted that 3,000 categories of memorabilia would be available through the site, and Schutzbank completed by demonstrating the remaining features of the system. Since there was very little inventory on the site during the demonstration, Mr. McLaughlin again asked MK about the Dealer network. MK represented that the Dealers were already under contract and it was just a matter of loading the inventory on the site.

26.   Based on the representations referenced in ¶¶ 16-25 above, Mr. McLaughlin expressed an interest in investing in COLLECTORS. MK said that Mr. McLaughlin would need to make a decision before the website launched and the TV contract was signed to lock-in the $1 per share price. At that time, MK introduced the concept of the "Inner Circle of Investors" of $1 million or more. MK emphasized that the Inner Circle of Investors would be provided early access to pertinent information regarding the company's progress, business performance, special invitations to events, access and use of company facilities, and an insider's view of COLLECTORS operations. Finally, MK pressed that he was soon to launch the transactional website and was in final negotiations on the TV contract and that it could be signed any day now.

27.     On Wednesday evening, October 1, 2014, MK sent a follow-up email to Mr. McLaughlin advising that he would send the investment documents as soon as a COLLECTORS non-disclosure agreement was signed.

28.     On Thursday morning, October 2, 2014, Mr. McLaughlin signed the non-disclosure agreement and sent it to MK with copy to David Chapman advising that he was looking forward to receiving the investment documents. The purported investment documents started to roll-in on Thursday morning, October 2, 2014. During this same time frame, Mr. Chapman called and re-emphasized the value associated with becoming an "Inner Circle Investor" at a $1 million minimum investment level. Like MK, Chapman highlighted early access to company progress and performance, special invitations to events, access and use of company facilities, and an insider's view of COLLECTORS operations.

29.     Within two hours, on Thursday, October 2, 2014 at 12:05 PM, Mr. McLaughlin was sent a "Welcome to the COLLECTORS family" email from MK. The last paragraph of the email highlighted the purported "Subscription Agreement subscribing you to 500,000 shares of our Series A Preferred Stock." MK added: "Counsel (Mr. Robert Sparks) has added some additional language, granting a limited option to purchase an additional 500,000 shares Series A preferred Shares with notice to the company required no later than Tuesday October 7, 2014, (See Section 1.3 of the Subscription Agreement)." Mr. McLaughlin noted that every prior deadline for investment was based on the website launch or the TV contract signing.

30.     On October 2, 2014, MK sent to Mr. McLaughlin via email a "Business Plan" for COLLECTORS and one page Executive Summary of COLLECTORS. This Business Plan and/or Executive Summary represented, inter alia, that:

.      COLLECTORS will revolutionize the industry by offering on-line over 3,000 categories and subcategories of collectibles in a safe "AUTHENTICITY INSURED" environment (emphasis in original);

.      the collectibles and memorabilia offered will be "pre-appraised, pre-authenticated and pre-insured";

.      the "centerpiece of the COLLECTORS Café brand is a TV series currently being

negotiated to be distributed for either national or international television in 2015";

.        the "show is hosted by legendary broadcaster Larry King and celebrity entertainer and former host of Hollywood Today Shawn King";

.        "with tens of millions of dollars in inventory being loaded for sale now, from which millions of dollars will net flow to the bottom line and with 50 Million shares authorized, the value in the $1.00 per share offer in the Private Placement Memorandum today, is prevalent";

.        "[T]he company is debt free and also holds an additional 25 million asset"; and

.        COLLECTORS Cafe has raised close to 20 million dollars from outside accredited investors.

31.      The Business Plan described a three phase "rollout strategy". In phase one, in the 4th quarter of 2014, the "plan calls for:

.        launch of a web portal consisting of a global marketplace and social networking site, partnerships with master dealers and user-generated auction consignments;

.        launch initial of [sic] live action and

.        a national public relations campaign across all media platforms".

32.      According to the Business Plan, phase two in the 1st quarter to 3rd quarter of 2015 "will see:

.        launch of the COLLECTORS Café Television Series;

.        Pre-Production of a National Radio show, further increasing audience reach and brand awareness;

.        Rollout of limited edition replica collectibles and licensing of collectibles- related products; and

.        Rollout of 'Celebrity Collect' on the website will allow fans to purchase directly from 100's of celebrities."

33.      According to the Business Plan, in phase three, by the 4th  quarter of 2015, "the Company will:

34.     "Rollout the international distribution of the television show as well as our announcement for our upcoming national collectibles convention, 'The Collector Bowl'".

35.     On October 2, 2014, MK also sent to Mr. McLaughlin via email a thick multi-page PPM dated *April 28, 2008*. In addition to this PPM, MK forwarded the following amendments to the PPM in an attachment to the email: 1st amendment (dated March 9, 2009), 2nd amendment (dated November 8, 2009) and 3rd amendment (dated August 15, 2014). Although the PPM and three amendments were labeled "draft", these offering documents were the only PPM and amendments provided to Mr. McLaughlin prior to the 1,000,000 "investment" in COLLECTORS (more than six years after the date of the PPM).

36.     The April 28, 2008 version of the PPM sent to Mr. McLaughlin represented, inter alia,  that:

.     the total aggregate offering amount was $10,000,000 (with 50,000,000 shares authorized);

.     the securities are being offered by COLLECTORS for the "general purpose of retiring existing company debt";

.     Company "reserves the right to pay up to 15% of the aggregate offering amount for commissions and fees to licensed broker-dealers or sales representatives";

.     that upon funding, MK will receive $300,000 and a stock bonus plan as compensation for past services;

.     the founders of COLLECTORS are MK and Gary L. Ferrell; and

.     COLLECTORS owes approximately $600,000 in "promissory notes" to MK.

37.     Later the evening of Thursday, October 2, 2014, Mr. McLaughlin received an invitation to an event at AON Risk Solutions signed by MK and two others to attend an event on Tuesday morning, October 7, 2014 titled: "Please join us to meet Collectors Café: Mykalai Kontilai, Larry and Shawn King and Mr. Carlos Slim" and "The purpose of our meeting is to provide our Insurance Partners with a special, private preview of the first Collectors Café episode, and introduce the Kings and Mr. Slim to representatives of the participating Collectors Café Insurance Partner Consortium." The email also represented that Carlos Slim, principal investor

and co-owner of Ora TV "will be producing Collectors Café for distribution on global television." Mr. McLaughlin confirmed his attendance to MK on Friday morning, October 3, 2014.

38.     In reliance on the representations detailed in ¶¶ 16-25; 30-37 above, on October 6, 2014, BLUE SUNSETS "invested" $500,000 into COLLECTORS. BLUE SUNSETS and received stock certificates for 500,000 shares of Series A preferred shares of COLLECTORS.

39.     McLaughlin attended the presentation on the morning of October 7, 2014, regarding COLLECTORS at 199 Water Street the headquarters of AON in New York City. Present at this meeting were various insurance representatives and executives, MK, Dave Chapman, Larry and Shawn King and Karl Ege, Mr. King's business manager, Pamela Newman, Regina Steinborn (a member of Pamela's Team and a personal friend) and Jason Schutzbank, the website developer.

40.     At this meeting, the following representations were made by MK to Mr. McLaughlin and other meeting attendees:

. talk show host Larry King and his wife Shawn King will be hosting a weekly TV show called COLLECTORS Café;

. Carlos Slim, a billionaire Mexican magnate is a business partner with Larry King and MK in COLLECTORS;

. Carlos Slim will underwrite the TV production costs for COLLECTORS through ORA TV, a television production company funded and owned by Carlos Slim;

. Carlos Slim will distribute COLLECTORS'S TV show through ORA TV and to Central America via his mobile phone company, America Movil;

. the transactional website for COLLECTORS will be fully operational by year end 2014;

. that COLLECTORS has entered into contracts with 400 dealers to transact inventory in excess of $3,000,000,000 (THREE BILLION DOLLARS) through COLLECTORS'S website; and

. that COLLECTORS was the exclusive owner of the highly valued and sought after piece of American history; the original signed contract of Jackie Robinson (the first

-13-

black baseball player to play in modern day major league baseball). This unique piece of memorabilia would be used to draw attention to the Collectors café transactional website.

41.     Thereafter Larry and Shawn King explained their roles and played the first episode of Collectors Café followed by Jason Schutzbank's demonstration of the transactional website. The meeting ended with a short question and answer session from the insurance carriers and the meeting came to a close.

42.     Immediately following the meeting, MK and Mr. Chapman had lunch with Mr. McLaughlin in the first floor restaurant at 199 Water Street to address remaining questions and press McLaughlin to become an "Inner Circle Investor" by exercising the option for the second $500,000 investment which was set to expire that day. As a result of the presentation meeting and reconfirming the launch timeframe, Mr. McLaughlin asked MK for an extension on the option to purchase the additional 500,000 shares until Thursday, October 9, 2014. MK approved the extension but highlighted that McLaughlin needed to make a decision because the TV contract was in final negotiation and the website would be launched within the next 30 days.

43.     As a result of and in reliance on the representations made above in ¶¶ 16-25; 30-37; 40-41, BLUE SUNSETS, on October 9, 2014, made an additional "investment" of $500,000 (in addition to the October 6, 2014 purchase for a total of $1,000,000) in COLLECTORS'S Series A preferred stock. A subscription agreement related to the initial $500,000 investment on October 6, 2014 represented that the COLLECTORS'S shares were "being offered and sold in reliance on exemption from registration provided by Sections 3(b) and/or 4(2) of the 1933 Act and Regulation D promulgated thereunder".

44.     A review of the United States Securities and Exchange ("SEC") Edgar database confirmed that at no time did COLLECTORS file a Form D with the SEC as required in connection with the offer and sale of these unregistered securities to the public. Further, in order to sell these unregistered shares to BLUE SUNSETS, (a Connecticut resident) Defendants were required to file for and obtain an exemption to sell these unregistered securities to Connecticut residents. Correspondence with the Connecticut Securities and Business Investments Division

confirms that COLLECTORS filed no registration statement, no notice of claim for exemption and no business opportunity filing as required under Connecticut Uniform Securities Act ("CUSA") §36b-31-21b et. seq. Confirmation of Defendants' failure to file for and obtain federal and state exemptions to sell these unregistered securities were obtained by counsel in February 2017 in preparation of the instant claim.

45.     Between October 9, 2014 and December 31, 2014 McLaughlin questioned MK and Chapman from time to time about COLLECTORS progress versus the communicated launch plans that constituted, in large part, the basis for BLUE SUNSETS investment. Even though Mr. McLaughlin understood the challenges associated with a business launch, McLaughlin was concerned that none of the "big 4" components of COLLECTORS business plan had launched in 2014. COLLECTORS did not populate the website with the inventory under the purported Dealer contracts in 2014, COLLECTORS did not launch the transactional website in 2014, COLLECTORS did not sign the TV Contract in 2014, and the Collectors Café TV Show with Larry and Shawn King did not launch in 2014 as planned, presented, and communicated by MK and Mr. Chapman in the meetings, discussions, and demonstrations used to induce McLaughlin's investment in COLLECTORS.

46.     In early December 2014, Mr. Chapman approached Mr. McLaughlin about participating in a "screen test" to host a segment of COLLECTORS called the "Collector Investor." Mr. McLaughlin expressed an interest as a public vehicle that could help support the launch of his book: "The Purpose Is Profit: The Truth About Starting and Building Your Own Business." Mr. McLaughlin advised Mr. Chapman that it was too close to Christmas to make a trip out to Los Angeles in mid-December. Mr. Chapman persisted and Mr. McLaughlin agreed to make the trip. As outlined in the agenda sent by Mr. Chapman to Mr. McLaughlin on December 10, 2014, McLaughlin would be meeting with Gail Holt, COLLECTORS Chief Operating Officer ("COO"), Larry and Shawn King and his business manager, Karl Ege, Rick Joseph, Entertainment Counsel, Ron Bloom of Bitesize TV, and Steve Jackson, a significant investor in COLLECTORS. Ron Bloom handled the screen test and all of the meetings went well. Upon McLaughlin's return, MK sent an email to Mr. McLaughlin on December 17, 2014 saying that he had reviewed the

screen test and relayed that "the camera likes him (you)" and then suggested "the next step is to see if we can come to some sort of agreement on the business side." MK's email continued that: "this would need to take place sooner rather than later as we are making a final selection prior to the business holiday."

47.    Upon receiving MK's email, Mr. McLaughlin called Mr. Chapman to decipher the meaning. Mr. Chapman drove to Mr. McLaughlin's home in Connecticut to share that MK wanted Mr. McLaughlin to invest $4 million of additional capital to secure the role of the "Collector Investor."

48.    On December 17, 2014, McLaughlin advised MK "if you want me to write a check, then I need to remove myself from consideration." MK's reaction was to respond to Mr. McLaughlin's email: "It is not important that you personally write a check for consideration, but the company must benefit with some financial consideration on this project in return for the business opportunity." Then MK proceeded: "Another candidate offered to raise some capital for a non-dilution post launch round at a higher valuation. This is something that could work as well."

49.    On December 18, 2014, Mr. McLaughlin wrote to MK again stating: "There was no upfront discussion whatsoever around paying for the role. If I had been informed of that request in advance, I would have communicated my concerns upfront and changed the trip plans accordingly." Then Mr. McLaughlin closed by saying again: "you should pursue your alternatives for the role."

50.    This resulted in a string of emails from MK and Chapman subtly pressuring McLaughlin to raise capital for the venture from McLaughlin's friends and business associates in exchange for the "Investor Collector" role. Again on January 4, 2015, McLaughlin wrote to MK with copy to Rick Joseph, COLLECTORS Entertainment Counsel, and Dave Chapman: "I am writing to give you a heads-up that you should pursue other alternatives for the Collector Investor role. After much reflection, I cannot represent the investment to my friends and business relationships without being clear that I have something to gain." This resulted in more pressure causing McLaughlin to write MK with copy to Joseph and Chapman on January 5, 2015:  "After

reflecting over the holidays, I concluded that I was not comfortable sourcing additional investment dollars in exchange for filling the role."

51.     MK continued to press Mr. McLaughlin to assume the Collector Investor role and McLaughlin even reconsidered. On January 12, 2015, MK sent McLaughlin a specific script to be used for sourcing funds from friends, family, and business associates. The script enumerated most of the major components of the business (none of which had come to fruition). The last few words in the email read: "…this amazing deal sells itself."

52.     McLaughlin was not comfortable with the situation and consulted with M. Ridgway Barker, Head of the Securities Practice at Kelley Drye & Warren. Ridg Barker was a friend of McLaughlin's for almost 25 years. Barker stated to McLaughlin that you cannot source funding without very clearly specifying that you are not a registered broker/dealer and you cannot be compensated for making an introduction. After a final consultation with Mr. Barker, McLaughlin made a final decision that he would not source any capital for COLLECTORS.

53.     In the end analysis, like everything else with COLLECTORS, the "Collector Investor" role was never implemented because the COLLECTOR TV show never launched. It is now apparent that the whole thing was a sham to pressure and induce McLaughlin to invest more money and/or source money from unsuspecting friends and business associates. McLaughlin did not invest any more money in COLLECTORS and McLaughlin did not source any money from his friends and/or business associates for COLLECTORS.

54.     Given McLaughlin's dealings with MK in December 2014 and January 2015, and since none of the "big 4" components of the COLLECTORS business had launched in 2014; McLaughlin became increasingly uncomfortable with his investment in COLLECTORS. Additionally, although an Inner Circle Investor, McLaughlin had no access to information regarding company progress and no access to financials or business performance information. Up to that point in time, the only source of information about COLLECTORS was through 1-off phone calls with MK. Since every phone call with MK was a pitch for more money and McLaughlin was starting to question MK's integrity, McLaughlin did not trust the content of a 1-

off phone call with MK. In effect, MK could say anything on a phone call but never be held accountable because no one else would simultaneously hear what MK was saying.

55.     In an effort to secure a progress update, McLaughlin attempted to coordinate a dinner meeting with MK in New York in mid-March 2015 and when that failed, at Mr. McLaughlin's home in April 2015. Neither meeting took place.

56.     At Mr. McLaughlin's request, a phone call for Sunday, April 12, 2015 was scheduled between MK and McLaughlin. In advance of the call, McLaughlin sent an email to MK on Sunday, April 12, 2015 requesting (McLaughlin was seeking transparency about COLLECTORS): "I would like to know what is working and what is not working (progress vs. goals, opportunities, and challenges)." In the email McLaughlin wrote: "I have made bigger investments that have failed – so I am not afraid of a bad outcome – I just want to be informed and maybe help -rather than be surprised." McLaughlin also wrote: "I have generated a list of questions to maximize the productivity of the call. I do this as a matter of course for all of my investment calls. Based on your (MK's) request (not to send the written questions), I will not send them to you in advance – unless you advise me otherwise." Rather than field 1-off phone calls, McLaughlin asked MK to produce a "single-page bullet-ized Monthly Investor Report listing accomplishments, opportunities, challenges and inhibitors to success."

57.     MK responded to McLaughlin's email on Sunday, April 12, 2015: "I have no idea where you are getting the impression that the company is in a bad place or why you feel the need to ask me that question." The manipulation continued when MK added: "It feels like to me, that things became strained with our relationship after we interviewed you for the Collector Investor Digital role and all that went along with that process."

58.     During the April 12, 2015 phone call, MK failed to address that none of the "big 4" components of COLLECTORS business plan had launched in 2014. During this conversation, Mr. McLaughlin stated in words or substance to MK that: "You have a fiduciary responsibility to take the horse (COLLECTORS) out of the barn (launch the business) and let it break from the gate (secure market feedback) and run the race (succeed or pivot and try again). I understand that the jockey may get thrown from the horse or the horse may break its leg or the horse may come in

dead last. Your investors have put their good faith in you to fulfill your promises and let the horse run the race."

59.     On Monday, April 13, 2015 McLaughlin wrote to MK: "I still have questions that I would like to get answered. I will send my questions to you this afternoon. Next time we talk, we should share the speaking time during the call to ensure we both get everything on the table." McLaughlin continued: "I am not comfortable with the way the business plan and the business model seems to change so much at this late stage…Please keep in mind that investments were made under certain pretense – and the business has been in the thinking and adjust phase for years before my investment." McLaughlin relayed: "You can always make adjustments after lift-off based on results – but consuming capital without a specific plan is risky."

60.     On Tuesday, April 14, 2015 McLaughlin requested a copy of COLLECTORS'S financial statements and sent along his list of questions to MK. The list of investor questions are summarized below:

        A.     What is the status of the Business Model?

        B.     Who makes up the Collectors Café Management Team?

        C.     What is the status of Carlos Slim's involvement?

        D.     What are the primary assets of Collectors café?

        E.     Does Collectors café still own the Jackie Robinson Contract?

        F.     Can you send me a set of Financials on the Collectors Café Business? (Monthly income Statement, Balance Sheet, etc.)

        G.     Where does the Collectors café Business operate (NYC, Las Vegas, San Diego?)

        H.     What is the status of the Television Show? Is Larry King still hosting the TV Show? When will the Collectors Café TV be broadcasted?

        I.     What is the status of the internet site (transaction site)?

        J.     What is the status of the Collectibles Providers/Dealers?

        K.     What are the primary inhibitors to success?

        L.     Who are the primary investors in the Collectors Café business?

M.   Besides Collectors Coffee, does Collectors Café go under any other legal name?

61.   Via email on April 14, 2015, MK responded to Mr. McLaughlin's email stating that he will only communicate via the phone or through (verbal) updates or (verbal) status reports to all investors. MK failed to answer any of Mr. McLaughlin's questions and did not provide any of the requested financial statements for the company.

62.   Although the PPM referenced By-Laws, Articles of Incorporation and Financials in an appendix, no such documents were attached and, although requested, no such documents have ever been provided to Plaintiffs.

63.   On May 3, 2015, McLaughlin sent MK the following: "I have been mulling our recent correspondence and dialogue. I am not comfortable. It is my opinion that the attached questions that I have raised are questions that any investor would be entitled to know before and during the life of their investment. I will validate my opinion with an attorney." McLaughlin continued: "Also, I want to go on record that I disagree with many of your comments and characterizations in your correspondence. In regards to this matter, you do not need to tell me what I can do or what I cannot do. Any more than I can tell you what to do or not to do. The playing field is perfectly level and I am sure that neither party is intimidated." On May 4, 2015, Mr. McLaughlin received a response from Gail Holt, COO of Collectors Café. "I believe you are mistaken if you believe you have a legal right to this information based upon your current investment in the Company."

64.   Between mid-May, 2015 and November 16, 2015, McLaughlin focused on completing his book *The Purpose Is Profit*. During this time frame, Mr. McLaughlin spoke infrequently with MK and Dave Chapman about COLLECTORS progress. However, Mr. McLaughlin was very concerned that another year had gone by without completing and launching any of the "big 4" components of COLLECTORS business plan in 2015. COLLECTORS did not populate the website with the inventory under the purported Dealer contracts in 2015, COLLECTORS did not launch the transactional website in 2015, COLLECTORS did not sign the TV Contract in 2015, and the Collectors Café TV Show with Larry and Shawn King did not

launch in 2015 as represented by MK and Mr. Chapman in the meetings, discussions, demonstrations, and referenced in the purported investment documents used to induce McLaughlin's investment in COLLECTORS.

65.     Then on November 16, 2015, McLaughlin received an email from MK labeled: Official Collectors Café Launch. McLaughlin was skeptical but cautiously optimistic. The announcement from MK read as follows: "The Company will launch on a date during the week of January 25, 2016 through January 31, 2016. The launch will include the unveiling of our Legendary Collectible Assets, National TV Appearances, the Launch of our CC North American Collectible Tour and a VIP Event. I would like to thank all of you personally for all your patience and support over the years and look forward to seeing you all soon."

66.     The prospect of the Collectors Café Business Launch and implementing the "big 4" plus the unveiling of the Jackie Robinson contracts offered renewed hope to Mr. McLaughlin and re-opened dialogue with MK.   In or around March 2016 Larry King and MK endorsed Mr. McLaughlin's book.

67.     The Launch was postponed until April 11, 2016 to coordinate with the anniversary of the signing of Jackie Robinson's contract. There would be an unveiling of the Jackie Robinson contract in Times Square with numerous luminaries including Larry King hailing the occasion. There was a black tie event in the Rainbow Room at Rockefeller Center that evening to formally kick-off Collectors Café. McLaughlin was excited to meet and connect with the other investors – until that point most of the COLLECTORS'S investors were kept separate from one another.

68.     McLaughlin attended the Rainbow Room Launch Party on April 11, 2016 and MK announced that COLLECTORS was launching the website and "the Collectibles Revolution was about to begin." MK thanked all of the investors for their patience and confirmed his commitment to fulfill all aspects of the COLLECTORS business. In addition to the launch of the transactional website, MK stated he would be leading a national tour with the Jackie Robinson contracts (which had recently been formally appraised at $36 million dollars) to optimize TV coverage purportedly for the formal public launch of COLLECTORS.

69.     In an effort to improve McLaughlin's relationship with MK and acknowledge the COLLECTORS launch, McLaughlin wrote an email to MK on April 12, 2016 stating: "I learned a lot last night. You are a first rate guy all the way! It was so nice to meet so many wonderful people – and especially nice to meet your wife. I am very excited about Collectors Café and the wonderful team that you have organized to realize the vision. It is really exciting to see the business lift-off." McLaughlin would soon find out he had written his acknowledgement too soon.

70.     MK launched the COLLECTORS transactional website the next day. The centerpiece of the website launch was the Jackie Robinson contract but, COLLECTORS investors soon learned that the website was very sparsely populated with collectibles. The Dealer inventories that had been promised were not on the website. The site did not have much more inventory on it than when McLaughlin was given an early demonstration.

71.     As Chapman highlighted and MK confirmed, based on a $50 million valuation of COLLECTORS, a $1,000,000 investment in COLLECTORS would equate to a 2% ownership in the Jackie Robinson contracts with a prorated value of $720,000 (now that a formal appraisal had been completed at $36 million). The Jackie Robinson contract alone purportedly provided McLaughlin with a hard asset of value equivalent to more than 70% of McLaughlin's $1,000,000 investment.

72.     In hopes that the Dealer inventory would soon be populated on the website, McLaughlin wrote a blog about the COLLECTORS Launch and the Jackie Robinson contracts. McLaughlin asked MK and Larry King's manager, Karl Ege, for approval to post the blog. Karl gave his approval with one major edit. The original title of the blog was "Investing with Larry King and Mykalai Kontilai" Karl Ege asked McLaughlin to change the first word in the title from "Investing" to "Engaging". McLaughlin asked Karl Ege why Larry King wanted that change and Karl Ege shared that Larry King did not want people thinking that Larry King endorsed the investment in COLLECTORS.

73.     In July 2016, with permission from Larry King and MK, McLaughlin published a supportive blog and posted it in his newsletter. After hearing about Larry King's concerns, McLaughlin was cautious in his writing. The last line of the blog post reads: "Like all new

business launches, there is a tremendous amount of work and implementation risk – but it's an exciting time for Mykalai and all the stakeholders in Collectors Café."

74.     Contrary to Defendants' repeated representations, the transaction website was never populated with the Dealer inventory and was shut-down shortly after the July 2016 blog. The COLLECTORS Launch never got off the ground. Between September 2016 and mid-December 2016 McLaughlin hardly spoke with MK and Chapman about COLLECTORS.  As in 2014 and 2015, in 2016, none of the "big 4" components of COLLECTORS business plan had launched. COLLECTORS did not populate the website with the inventory under the purported Dealer contracts in 2016, COLLECTORS did not launch the transactional website in 2016 (other than an unpopulated version for a few months), COLLECTORS did not sign the TV Contract in 2016, and the Collectors Café TV Show with Larry and Shawn King did not launch in 2016 as represented by MK and Mr. Chapman in the meetings, discussions, demonstrations, and referenced in the purported investment documents used to induce McLaughlin's investment in COLLECTORS.

### Jencess' Introduction to COLLECTORS AND MK

75.     Kirk Jensen received an email from a business acquaintance, Brian Gaudet, who he was introduced to by a mutual friend in 2008.  Mr. Gaudet said that there was an investment opportunity that sounded very promising.  On February 27, 2015, Gaudet forwarded an email from Cori Dyer to Mr. Jensen. This email had a link to a two minute "sizzle reel" describing COLLECTORS that featured Larry King and his wife Shawn. This email represented in bold letters that:

> **"Right now we have three billion dollars in merchandise on our COLLECTORS Café website. We launch both the show and the collectorscafe.com website in 60 days."** (emphasis in original).

76.     A conference call was held on March 2, 2015. On the call were MK, Mr. Jensen, Mr. Gaudet, Mr. Cole Merrick (who represented himself as a computer programmer for COLLECTORS), Ms. Dyer and other prospective investors. During this call MK represented that:

.     there was $3.25 Billion of merchandise loaded on COLLECTORS'S website;

.     COLLECTORS had contracts with over 400 Dealers;

.       profit for COLLECTORS is 20% from the Dealer/Seller and 20% from the buyer, with a profit margin of approximately 65% with no inventory cost;

.       COLLECTORS'S website launching in 60-90 days;

.        Dealers were subject to eight background checks before permitted to appear on the TV program and COLLECTORS'S website;

.       AEON Affinity is handling claims and customer service;

.       COLLECTORS and MK have created fraud protection called Authenticity Insurance from major insurance companies, including Lloyds of London Underwriters, AIG and Liberty Insurance;

.       COLLECTORS has no debt and MK has funded operations from his own pocket;

.       MK represented that COLLECTORS was the sole owner of the original Jackie Robinson contracts valued at $36 Million Dollars

.       MK, along with Larry and Shawn King will host the COLLECTORS show; and

.       MK met Carlos Slim last year and Slim has partnered with COLLECTORS.

77.     Another investor conference call was held on March 3, 2015. Participating on this call were Mr. Jensen, MK, Cole Merrick, Brian Gaudet, Ms. Dyer and other investors. During this conference call with MK, the representations made in the March 2, 2015 conference call as detailed in ¶76 were repeated.

78.     Over the next two weeks, Mr. Jensen requested to see proof of the dealer network by seeing samples of signed dealer contracts, as without dealers there would be no inventory, thus there would be no sales, and thus there would be no commissions/revenues for the company. MK represented that he could not provide copies of the dealer contracts because of non-disclosure agreements.

79.     On March 13, 2015, in response to these requests, MK set up a conference call with Pete Segal, a proposed "master dealer" from New York.  Participating on this call were Mr. Jensen, MK, Dave Chapman (who introduced himself as V.P. of Investor Relations), Peter Segal (who represented himself as a Master Dealer and doing business with COLLECTORS) and

Chester Aldridge, another potential investor. During this conference call with MK, the following representations were made to Mr. Jensen:

- MK represented that he has perpetual, exclusive, non-terminating agreements with hundreds of Dealers;

- MK represented that he had $3.5 Billion Dollars of merchandise loaded on the COLLECTORS website;

- COLLECTORS receives 20% commission on all items sold on its website while other auction houses receive 25%;

80.     As a result of and in reliance on the representations made above in ¶¶ 75-77; 79, JENCESS, on or about March 18, 2015 "invested" $200,000 in COLLECTORS'S Series A preferred stock. A subscription agreement related to this  investment dated March 12, 2015 represented that the COLLECTORS'S shares were "being offered and sold in reliance on exemption from registration provided by Sections 3(b) and/or 4(2) of the 1933 Act and Regulation D promulgated thereunder and are being registered for sale under the securities laws of the State of California".

81.     As reflected in ¶44 herein, Defendants never filed a Regulation D filing with the SEC nor any documents as required under CUSA. Plaintiffs also confirmed that COLLECTORS has not filed any registration or exemption to sell securities in the State of California. Review of California state records reflect that the only filing by COLLECTORS was with the Secretary of State and had nothing to do with the sale of securities. That filing is presently in suspended status due to action taken by the State Franchise Tax Board.

82.     On or about March 13, 2015, Defendants sent to Mr. Jensen, by David Chapman via email, a PPM for COLLECTORS dated April 28, 2008. Although this PPM bears the same date and refers to the same offering as the PPM Defendants forwarded to Mr. McLaughlin, a review of these documents reflects irreconcilable and material differences. For example, the April 28, 2008 PPM disseminated to Mr. McLaughlin represents that there were 10,000,000 aggregate shares offered while the April 28, 2008 PPM provided to Mr. Jensen represented that there were 12,500,000 aggregate shares offered.  The version of the initial PPM to Mr. McLaughlin reflects

that the proceeds of the offering will be used to retire "existing company debt" while the PPM for the same offering provided to Mr. Jensen omits that material fact and represents that proceeds will be used for the "purpose of funding initial infrastructure, operating capital and phase 1 expansion of the company". One PPM represented that the founders of COLLECTORS were Gary Ferrell and MK while the other version represents that MK is the founder.

83.     Although the PPM disseminated to Mr. Jensen refers to "financial statements" purportedly to be found under "risk factors", no such financial statements were included. A careful review of this document by counsel in preparation of this claim reflects that it appears to be a cut and paste using various different fonts and contains repetitive word for word paragraphs and misspellings.

84.     On April 14, 2015, Dave Chapman traveled to Edmonton Canada to meet with Mr. Jensen, other investors, along with potential investors in COLLECTORS. Mr. Jensen met with Mr. Chapman at the Sandman Hotel on the morning of the 15th or April. At this meeting Chapman discussed the launch of the website and purported contracts that COLLECTORS had.

85.     On May 6, 2015, Mr. Jensen was invited to meet with Larry King and MK at Mr. King's Beverly Hills home and thereafter go out to dinner with Mr. and Mrs. King, and Mr. King's agent. Also present were Brian Gaudet, David Chapman, Ms. Holt (COO) and another potential investor. At this meeting MK represented to Mr. Jensen that:

.     Larry King would be appearing on the COLLECTORS shows with MK;

.     the COLLECTORS show would be aired world-wide; and

.     the Jackie Robinson contracts will be shown for sale on the launched website.

86.     During this May 6, 2015 meeting, Mr. Jensen was given a booklet by MK entitled "Jackie Robinson's Contracts – Founding Documents of the Civil Rights Movement" that showed the Jackie Robinson contracts valued at $36 Million Dollars by Seth Keller on January 25, 2015. Further, Mr. Jensen was shown, on MK's laptop, a letter on MLB letterhead referring to a partnership MLB would purportedly like to enter into with COLLECTORS.

87.     On or about May 15, 2015, in reliance on the representations made above in ¶¶ 75-77; 79; 84-86, JENCESS "invested" an additional $300,000 in COLLECTORS'S Series A preferred stock.

88.     In an email dated November 16, 2015 from MK with subject "Official COLLECTORS Café Launch" addressed to all "COLLECTORS Café Believers" MK represented:

.     "It is with great joy and excitement that after many years of development and preparation, that we are announcing the OFFICIAL LAUNCH of the COLLECTORS CAFÉ BRAND, COMPANY and COLLECTIBILES REVOLLUTION!!!!" (emphasis in original)

.     "[T]he Company will launch on a date during the week of January 25, 2016 through January 31, 2016."

.     "[T]he launch will include the unveiling of our Legendary Collectibles Assets, National TV Appearances, the launch of our CC North American Collectible Tour, and VIP event."

89.     Throughout 2015 and 2016 COLLECTORS and MK represented to Plaintiffs that the website was to be launched on April 15, Jackie Robinson Day, at the 2015 MLB All Star Game; the 2015 MLB Post season; at an end of the year launch, the week of January 25, 2016 in conjunction Jackie Robinson's birthday, etc. Each of those deadlines came and passed without a launch of the transactional website populated with many millions of dollars of dealer inventory or the TV show or any meaningful business.

90.     In addition to the material misrepresentations and omissions made to Plaintiffs, the sale of these investments were illegal in that COLLECTORS  was not only the issuer but self-underwrote the offering of its securities. By selling COLLECTORS'S securities directly to Plaintiffs (through compensated intermediaries Mr. Chapman and Mr. Gaudet), defendants were acting as unregistered broker dealers and underwriters in the sale of these securities.

**THE TRUTH COMES OUT**

91.     In early December 2016, McLaughlin received a phone call from Cori Dyer, a prior marketing and media consultant with COLLECTORS. Mr. McLaughlin met Ms. Dyer at the

formal COLLECTORS Launch Party at the Rainbow Room in New York City on April 11, 2016. During this December 2016 phone call, Ms. Dyer stated she was organizing a consortium of investors to discuss MK's mismanagement of COLLECTORS and what could possibly be done to attempt to rectify the situation. Cori Dyer shared that she had a direct line of communication with other COLLECTORS employees and/or officers including Dave Chapman, Funding & Sales;  Gail Holt, COO; Rick Joseph, Entertainment Counsel and Lilibeth Feliciano, Investor Relations. Thereafter there were numerous phone calls, text messages, and emails coordinated by Cori Dyer to strategize ways to extract value from the investment. The participants on the calls included Cori Dyer, Kirk Jensen, Rick Joseph, Ed McLaughlin, and on certain occasions, Steve Jackson.

92.    On December 14, 2016, Dave Chapman picked-up Ed McLaughlin in Metropark, NJ to discuss concerns about COLLECTORS with Mr. McLaughlin. Mr. Chapman and Mr. McLaughlin had lunch together in Spring Lake, NJ at the On Third Café and Coffee Co. In a conciliatory tone, Mr. Chapman informed Mr. McLaughlin that he was aware that Cori Dyer was communicating with several investors regarding their "investments" in COLLECTORS. Mr. Chapman stressed to Mr. McLaughlin that Cori Dyer could be trusted.

93.    During the lunch meeting on December 14, 2016, Mr. Chapman relayed that he was fed up with MK and that MK had lost most of his key employees due to business/personal integrity issues and/or non-payment or late payment of compensation including: Rick Joseph, Gail Holt, and Cori Dyer.

94.    On December 28, 2016 at 12:00pm ET, a conference call coordinated by Cori Dyer with Ms. Dyer, Steve Jackson, Mr. McLaughlin and Mr. Jensen was conducted.  It was on this phone call Mr. Jackson stated that he owned a significant share of the Jackie Robinson contracts and he was organizing a legal action to attempt to force the sale.  According to Mr. Jackson, upon the sale of the Jackie Robinson contracts, the proceeds would be split as follows: 10% of the proceeds off the top going to the Jackie Robinson Foundation and 10% of the proceeds off the top going to Larry King. The remaining balance of the proceeds would be split equally between COLLECTORS/MK (40% of the proceeds) and Mr. Jackson's investor group (40% of the

proceeds). This was counter to all prior representations made by MK to Plaintiffs about COLLECTORS ownership of the Jackie Robinson contracts.

95.    Plaintiffs learned for the first time that COLLECTORS/MK was merely a minority owner and the calculations backing each investment were false and materially misrepresented.

96.    Cori Dyer told McLaughlin that COLLECTORS was paying the bills for MK's lavish hotels, meals and living expenses, including but not limited to, hotels and housing in Las Vegas, New York, Miami, etc.

97.    Cori Dyer shared that many consultants and employees were not paid in full and on-time. Ms. Dyer relayed that Gail Holt (former COO), was frustrated due to MK's behavior patterns and the manner in which he was running the business and handling financial obligations. Other former employees who have left COLLECTORS who have expressed deep frustration with management include Fabian Vincent, former CFO and Tara Selinas, a former blogger. Ms. Dyer informed Mr. Jensen that she went on the Collectors website and personally counted the amount of items available for sale and *as of September 2016 there were 852 items for sale and the total value of these items were less than $1 million dollars*. During this time frame, Defendants were representing to investors that COLLECTORS had $4.3 Billion Dollars loaded onto its website.

98.    According to Ms. Dyer, as of Sept. 18, 2016 there were no bloggers "signed up" to blog for COLLECTORS. During this time frame Defendants were representing to investors that there were 200 bloggers signed up for COLLECTORS with hundreds of more bloggers waiting in the wings. According to Ms. Dyer there were never hundreds of Dealers contracted with COLLECTORS and Chris Shutte, former Dealers Relations for COLLECTORS confirmed that there were *no dealers* signed up with COLLECTORS. Virtually nothing had been sold through COLLECTORS.

99.    To date there has been no proof of a dealer network or billions of dollars in inventory.  It is apparent that all the representations regarding the imminent signing of a TV contract, launch of a transactional website, value of the COLLECTOR's inventory, contracts with hundreds of dealers, need to invest now before price goes over $1 as alleged herein were part of Defendants' fraudulent scheme to entice Plaintiffs to invest under false pretenses.  Plaintiffs are

extremely concerned that MK has diverted their money to his own personal uses and will seek discovery to uncover exactly what defendants have done with Plaintiffs' money.

100.   It is nine years after the April 2008 PPM and none of COLLECTOR's core business has even gotten off the ground. The recent revelations of former key employees and officers of the COLLECTORS as detailed in ¶¶ 91-98 reflect that these Defendants have brazenly embarked on a massive fraud and that this whole venture was house of cards that is now being exposed.

## CLAIMS FOR RELIEF COUNT ONE

### AGAINST DEFENDANTS FOR FRAUD IN CONNECTION WITH THE PURCHASE OF SALE OF SECURITIES IN VIOLATION OF §10(B) OF THE EXCHANGE ACT [15 U.S.C. §78J(B)] AND RULE 10B-5 THEREUNDER [17 C.F.R. §240.10B-5]

101.   Plaintiffs reallege and incorporate herein paragraphs 1 through 100 above.

102.   Defendants knew, or were reckless in failing to know, of the material misrepresentations and omissions contained in the statements set forth above.  From at least July 2014 through the present, Defendants, directly or indirectly, singly or in concert, have made, and are making, use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the purchase or sale of securities issued by COLLECTORS, have knowingly, or with recklessness: (a) employed, or are employing devices, schemes, or artifices to defraud; (b) made, or are making, untrue statements of material facts, or have omitted, or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged, or are engaging, in acts, practices, or courses of business which have operated, or are operating, as a fraud or deceit upon persons, in connection with the purchase or sale of securities issues by COLLECTORS. In engaging in such conduct, the Defendants have acted with scienter, that is, with intent to deceive, manipulate, or defraud or with severe and reckless disregard of the truth.

103.   Plaintiffs have suffered substantial damages, in that, upon reliance on Defendants' material misstatements and omissions concerning COLLECTORS detailed above,  purchased 1.5 million dollars ($1,500,000.00) of COLLECTORS securities which has proximately caused

Plaintiffs damages in  the amount of $1,500,000. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, are violating, and unless enjoined, will continue to violate §10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

**COUNT TWO**
**FOR FRAUD**

104.    Plaintiffs reallege and incorporate herein paragraphs 1 through 103 above.

105.    As detailed in paragraphs 24 thru 100 herein, Defendants MK and COLLECTORS, individually, and in various conspiracies with one another, intentionally and/or willfully and wantonly engaged in wrongful, fraudulent and otherwise illegal schemes and representations to defraud Plaintiffs in connection with Plaintiffs' $1.5  million dollars invested in COLLECTORS, including but not limited to the false representations made to Plaintiff BLUE SUNSETS concerning populating the website with the inventory under the purported Dealer contracts in 2014; launching the transactional website in 2014; signing the TV Contract in 2014; launching the Collectors Café TV Show in 2014 with Larry and Shawn King; the use of the proceeds of the offering and, COLLECTORS'S 100% ownership of the Jackie Robinson contract; and, to Plaintiff JENCESS regarding COLLECTORS'S contracts with hundreds of Dealers; billions of dollars of merchandise loaded on the website; imminent launching of the website; COLLECTORS'S 100% ownership of the Jackie Robinson contract; the use of the proceeds of the offering; hosting of the Collectors Café TV Show by Larry King; and, world-wide airing of the show.

106.    Plaintiffs reasonably relied on Defendant MK's knowingly fraudulent representations as CEO, Chairman of the Board, and President of COLLECTORS.

107.    MK's and COLLECTOR's false representations were made with the intent to induce Plaintiffs to invest, collectively, $1.5 Million in COLLECTORS.

108.    As a direct result of Defendants' fraudulent conduct, Plaintiffs have suffered injuries in the amount of $1.5 Million Dollars.

**COUNT THREE**
**FOR UNJUST ENRICHMENT**

109.    Plaintiffs reallege and incorporate herein paragraphs 1 through 108 above.

110.    Plaintiffs conferred a substantial benefit on Defendants by virtue of their collective $1.5 Million investment in COLLECTORS.

111.    Based on Defendants materially false representations, as delineated herein, Plaintiffs had a reasonable expectation of repayment on their investment.

112.    Defendants realized, accepted and or retained the benefit of Plaintiffs' investment without payment or return of any of the value thereof.

113.    As a result, Defendants have been unjustly enriched.

**COUNT FOUR**
**FOR EQUITABLE RELIEF INCLUDING**
**ATTACHMENT AND CONSTRUCTIVE TRUST**
**AGAINST MK**

114.    Plaintiffs reallege and incorporate herein paragraphs 1 through 113 above.

115.    Upon information and belief, Defendant MK has converted $1,500,000 of Plaintiffs' monies for his own use and purpose. Plaintiffs request that this Court order a pre-judgment attachment of Defendant MK's assets in the amount of $1,500,000 on any and all assets held or maintained by this Defendant.

116.    As high-level investors who relied upon the representations and influence of Defendant MK as CEO, Plaintiffs enjoyed a confidential relationship with MK as CEO, Chairman of the Board, and President of COLLECTORS.

117.    MK has wrongfully retained the Plaintiffs' investment and/or monies in the amount of $1.5 Million under circumstances that are highly inequitable, and, indeed, fraudulent.

118.    Plaintiffs request that this Court order that a constructive trust be imposed on all assets of Defendant MK in an amount not less than the $1,500,000 Plaintiffs provided to Defendants.

/ / /

/ / /

**COUNT FIVE**
**FOR BREACH OF FIDUCIARY DUTY AGAINST MK**

119.     Plaintiffs reallege and incorporate herein paragraphs 1 through 118 above.

120.     By the acts, transactions, and courses of conduct alleged herein, MK, as, *inter alia*, Chairman of the Board, President and CEO, has violated his fiduciary duties of good faith, loyalty and due care to Plaintiffs as investors.

121.     The breaches of these duties are set forth in paragraphs 24 thru 101 herein.

122.     MK engaged in self-dealing, conflicts of interest and made numerous irreconcilable material misrepresentations and omissions to Plaintiffs. As such MK has intentionally and wrongfully disregarded the interests of Plaintiffs and other shareholders and investors in COLLECTORS.

123.     As a direct result of MK's breaches of fiduciary duty, Plaintiffs have suffered injuries in the amount of $1.5 Million Dollars.

**COUNT SIX**
**EQUITABLE RELIEF FOR AN ACCOUNTING**

124.     Plaintiffs reallege and incorporate herein paragraphs 1 through 123 above.

125.     Defendants have possession or control of Plaintiffs' investment in the amount of $1.5 Million.

126.     Plaintiffs demand that Defendants provide a full accounting regarding the use and/or status of Plaintiffs' $1,500,000 entrusted to Defendants.

**COUNT SEVEN**
**NEGLIGENCE**

127.     Plaintiffs reallege and incorporate herein paragraphs 1 through 126 above.

128.     By the acts, transactions, and courses of conduct alleged herein, MK, as, *inter alia*, Chairman of the Board, President and CEO, has negligently breached his duties of due care to Plaintiffs as investors and shareholders.

129.     The breaches of these duties are set forth in paragraphs 24 thru 101 herein.

130.    MK engaged in self-dealing, conflicts of interest, and made numerous irreconcilable material misrepresentations and omissions to Plaintiffs. As such, MK has failed to exercise reasonable care and negligently disregarded the interests of Plaintiffs and other investors in COLLECTORS.

131.    As a direct result of MK's negligence, Plaintiffs have suffered injuries in the amount of $1.5 Million Dollars.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment as follows:

(a)     Compensatory damages in the amount to be determined at trial, relating to Plaintiffs' $1,500,000.00 (ONE MILLION FIVE HUNDRED THOUSAND DOLLARS) "investments";

(b)     An Attachment and Constructive Trust against the Defendants;

(c)     Reasonable costs and disbursements in this action;

(d)     Attorneys' fees;

(e)     Interest;

(f)     Rescission;

(g)     An accounting;

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

(h)      Punitive damages and

(i)      grant such other relief as this Court deems just and proper.

### **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues triable by a jury.


DATED this 17th day of January, 2018

**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**

By:      */s/ Don Springmeyer*
DON SPRINGMEYER, ESQ.
Nevada Bar No. 1021
JORDAN BUTLER, ESQ.
Nevada Bar No. 10531
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120
(702) 341-5200/Fax: (702) 341-5300

Timothy J. Dennin, Esq. (TJD 5117)
*(Pro Hac Vice to be Submitted)*
TIMOTHY J. DENNIN, P.C.
316 Main Street
Northport, NY 11768
(631) 261-0250
*Attorneys for Plaintiffs*